IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:13-CV-23173-DPG

ARTURO ROJAS, individually & on
behalf of all similarly situated,

      Plaintiffs,

v.

GARDA CL SOUTHEAST, INC.,

      Defendant.

_____/

**DEFENDANT'S MOTION FOR FINAL SUMMARY JUDGMENT ON PLAINTIFF'S
CLAIM AND MOTION FOR SUMMARY JUDGMENT ON THE OPT-IN PLAINTIFFS'
CLAIMS OR ALTERNATIVELY, MOTION TO DECERTIFY THE CLASS
WITH INCORPORATED MEMORANDUM OF LAW**

Defendant GARDA CL SOUTHEAST ("Garda" or "Defendant"), pursuant to Rule 56(c)

of the Federal Rules of Civil Procedure, and Rule 7.5 of the Local Rules of the U.S. District

Court for the Southern District of Florida, respectfully moves for the entry of final summary

judgment as to the claim pled by Plaintiff ARTURO ROJAS ("Plaintiff" and/or "Rojas") on

behalf of himself and alleged similarly-situated others. To the extent that summary judgment is

not granted on the opt-ins plaintiffs' claims, Garda alternatively moves to decertify the class. In

support of its Motion, Garda submits the following Memorandum of Law.

**I.     INTRODUCTION**

The transportation of currency is the transportation of property in interstate commerce, as

that term is defined by the Motor Carrier Act. Indeed, every court that has looked at this issue

has reached the same conclusion. *Baez v. Wells Fargo Armored Service Corp.*, 938 F.2d 180,

181-82 (11th Cir. 1991); *Hernandez v. Brink's, Inc.*, Case No. 08-20717-CIV-

1

MOORE/SIMONTON, 2009 U.S. Dist. LEXIS 2726, at *7 (S.D. Fla. Jan. 15, 2009); *Bule v. Garda CL Southeast, Inc.,* Case No. 1:14-cv-21898-FAM, Order on Motion for Judgment on the Pleadings as to Counts IV and V (July 17, 2014); *Vallejo v. Garda CL Southwest, Inc.,* Case No. 4:12-cv-00555*,* Memorandum and Opinion (September 29, 2014).  Yet, despite the lack of any material differences from the facts presented in the aforementioned authority, Plaintiff, who worked for Garda[1] as driver/messenger at Garda's Orlando Branch in Orlando, Florida until May of 2013, contends otherwise.  [ECF NO. 1 ¶¶9, 22].

On September 2, 2013, Plaintiff filed this action in which he alleges that Garda violated the Fair Labor Standards Act (FLSA), 29 U.S.C. §201 *et seq.*, by classifying him as an exempt employee under the Motor Carrier Safety Act ("MCA") and failing to compensate him at the rate of one-and-one-half times his regular hourly rate for hours worked between forty and fifty per week.  *See generally*, Plaintiff's Complaint at ECF No. 1.

The undisputed facts establish that Plaintiff and each opt-in plaintiff, like the armored car personnel in *Baez*, *Hernandez*, *Bule,* and *Vallejo*, were properly classified as exempt from the overtime provisions of the FLSA.  The undisputed evidence demonstrates that Plaintiff and the armored vehicle crew members who concededly picked up monies from, and delivered monies to, commercial establishments, Automated Teller Machines, government institutions, and banks located in Florida are exempt, as a matter of law, from the overtime requirements of the FLSA pursuant to Section 213(b)(1) of the FLSA, which exempts from the overtime requirement "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant" to the MCA.  29 U.S.C. § 213(b)(1).  Accordingly, Garda is entitled to summary judgment on Plaintiff's FLSA claim, as well as the

---

[1]  Garda is a full service cash logistics company that transports and handles currency, coins, checks, and other valuables for financial institutions and retailers.  (Statement of Undisputed Material Facts ("SUMF"), ¶1).

claims of the alleged similarly-situated individuals.  In the event that summary judgment is not granted on the claims of the opt-in plaintiffs, that can only be because an individual inquiry into the application of the MCA exemption is required, and procedural and fairness requirements require that such inquiry be made on an individual, as opposed to a class-wide, basis.

## II.   <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

Pursuant to Southern District of Florida Local Rule 7.5, Defendant's Statement of Undisputed Material Facts is filed contemporaneously herewith.

## III.   <u>SUMMARY JUDGMENT STANDARD</u>

The U.S. Supreme Court has unequivocally endorsed the right of a trial judge to grant summary judgment.  *Celotex v. Catrett*, 477 U.S. 317 (1986).  Rejecting limits on the granting of summary judgment, the Court has held that summary judgment is not a "disfavored procedural shortcut," but is an important part of the Federal Rules of Civil Procedure.  *Id.* at 327.  Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact to be decided at trial.  *Celotex Corp.*, 477 U.S. at 323.  When the non-moving party bears the burden of proof on an issue, the moving party need not offer affidavits negating the opponent's claim.  *Id.*  Instead, the moving party may discharge its burden by showing the Court that there is an absence of evidence to support the non-moving party's case.  *Id.*  at 325.

When a moving party meets its burden, the non-moving party must "go beyond the pleadings," and by affidavits or by "depositions, answers to interrogatories, and admissions on

file," designate specific evidence showing there is a "genuine issue for trial." *Id.* at 324. It is the non-moving party's obligation to come forward with specific evidence, not mere allegations. Summary judgment is proper if the non-moving party fails to make this requisite showing. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir. 1987). A mere "scintilla" of evidence supporting the non-moving party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252.

## IV.   LEGAL ANALYSIS

### A.   The Burden of Proof

An employer seeking to assert an FLSA exemption has the burden of proving that the employee falls "plainly and unmistakably within the terms and spirit" of the exemption. *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S. Ct. 453, 4 L. Ed. 2d 393 (1960). Due to the statute's remedial nature, exemptions from the FLSA's coverage are generally construed narrowly against the employers seeking to assert them. *Id.* That said, the MCA, the statute which provides the exemptions at issue in this case, is likewise a remedial statute and should also be broadly construed. *Galbreath v. Gulf Oil Corp.,* 413 F.2d 941, 946 (11th Cir. 1969) (quoting *Crescent Express Lines v. U.S.,* 320 U.S. 401, 409, 64 S. Ct. 167, 88 L. Ed. 127 (1943)); *Rodriguez v. Pan & Plus Baking, LLC*, 2013 U.S. Dist. LEXIS 55015 (S.D. Fla. Apr. 17, 2013)

For purposes of the MCA exemption, the term "interstate commerce" is broadly defined as "commerce between any place in a State and any place in another State, whether such commerce moves wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or water." *See* 42 Fed. Reg. 60078, 60079 (Nov. 23, 1977), citing former 49 U.S.C. §

4

303(a)(10).[2]  This determination is based upon the employer's conduct as a whole and not that of the individual employees.  *See Songer v. Dillon Res., Inc.*, 618 F.3d 467, 473-74 (5th Cir. 2010) ("We have stated 'it is the character of the activities, rather than the proportion of the employee's time or activities' that determines the Secretary's jurisdiction to regulate employees under the MCA (and therefore determines whether the MCA exemption of the FLSA applies).") (internal quotations omitted).  Indeed, in *Abel v. Southern Shuttle Servs*., 631 F.3d 1210, 1216 (11th Cir. (2011), the Eleventh Circuit noted that the U.S. Supreme Court has "described interstate commerce as 'an intensely practical concept drawn from the normal and accepted course of business.'" (citing *U.S. v. Yellow Cab Co*., 332 U.S. 218, 231, 67 S. Ct. 1560, 1567, 91 L. Ed. 2010 (1947), overruled on other grounds by *Copperweld Corp. v. Independence Tube Corp*., 467 U.S. 752, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984)); R*odriguez v. Pan & Plus Baking, LLC*, Case Number: 12-23193-CIV-MORENO, 2013 U.S. Dist. LEXIS 55015 at *12 – 13 (S.D. Fla. April 17, 2013) ("The United States Court of Appeals for the Eleventh Circuit has looked to 'practical considerations' when determining whether the shipment is in intrastate or interstate in nature. ... Accordingly, this Court takes a common-sense approach to the character of the defendant companies' shipments of bakery products.")(citing W*alters v. Am. Coach Lines of Miami, Inc.*, 575 F.3d 1221 (11th Cir. 2009), cert. denied, *Walters v. Am. Coach Lines of Miami, Inc*., 130 S. Ct. 2343, 176 L. Ed. 2d 561, 2010 U.S. LEXIS 2974 (2010)("Courts are guided by practical considerations in determining whether an employee's activities would be part of interstate commerce for purposes of the FLSA.") (internal citation omitted)).

---

[2]  Section 203(a)(10) of the Interstate Commerce Act (49 U.S.C.  § 303(a)(10) was replaced by Revised Interstate Commerce Act Provision, 49 U.S.C. § 10521, Pub. L. No. 95 473 § 4(b), 92 Stat. 1466 (1978); Pub. L. No. 97 449, § 7(b), 96 Stat. 2444 (1983), and subsequently by 49 U.S.C. § 31132. Pub. L. No. 98-554, § 204, 98 Stat. 2833 (1984).  There is no substantive change in the definition and scope of the term "interstate commerce."

Even more recent U.S. Supreme Court precedent confirms that broad construction of the term interstate commerce is required. Specifically, in *Christopher v. SmithKline Beecham Corp.*, the U.S. Supreme Court considered whether pharmaceutical sales representatives were "employed in the capacity of outside salesmen" and thus exempt from the FLSA's overtime requirements. 132 S. Ct. 2156, 2159 (2012). The Court's ruling turned on the interpretation of the phrase "sales" as defined by the FLSA. *Id.* The Court rejected the petitioners and the U.S. Department of Labor's argument that *Arnold* required it to construe the outside salesman exemption narrowly, distinguishing *Arnold* as inapposite when the issue involves the interpretation of a general definition that applies throughout the FLSA. *Id.* at 2172, n. 21. Accordingly, the Court construed the definition of the term "sale" broadly to include a physician's nonbinding commitment to prescribe a drug and thus found the sales representatives unmistakably exempt within the spirit of the applicable exemption. *Id.* Likewise, here, this Court should construe the definition of the term "interstate commerce" broadly as it is intended to be, and use "common sense" and "practical considerations" to thereby reach the inescapable conclusion, as did the courts in *Baez*, *Bule*, *Brink's*, and *Vallejo*, that the Plaintiff and Opt-In Plaintiffs' work for Garda falls squarely within the MCA exemption to the FLSA.

**B.    The MCA Exemption to the FLSA**

FLSA exempts from its overtime provisions "any employee with respect to whom the Secretary of Transportation has the power to establish qualifications and maximum hours of service pursuant to the provisions of [the Motor Carrier Act]." *Walters v. American Coach Lines of Miami, Inc.*, 569 F. Supp. 2d 1270, 1281 (S.D. Fla. 2008) (quoting 29 U.S.C. § 207(a) (1)). The Motor Carrier Exemption applies to employees for whom the Secretary of Transportation has the power to establish qualifications and maximum hours of service. 49 U.S.C. § 31502(b)(2) gives the Secretary of Transportation the general power to prescribe "qualifications

and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation."  Whether the MCA exemption applies "is dependent on whether the Secretary has the power to regulate, not on whether the Secretary has actually exercised such power."  *Baez v. Wells Fargo Armored Servo Corp.*, 938 F.2d 180, 181 n.2 (11th Cir. 1991); *see also Walters v. American Coach Lines Of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009) ("[T]he Secretary of Transportation does not have to exercise the authority granted to him by the MCA for the motor carrier exemption to be applicable; instead, his power to regulate under the act merely needs to cover a particular group of employees.").

According to the Department of Labor regulations enforcing the FLSA, the applicability of the MCA exemption "depends both on the class to which [the employee's employer] belongs and on the class of work involved in the employee's job." 29 C.F.R. § 782.2(a).  To fall within this exemption, an employee's work activities either "must relate directly to the transportation of materials moving in interstate or foreign commerce within the meaning of the [MCA]" or, if entirely intrastate, must constitute "a part of a 'practical continuity of movement' across State lines from the point of origin to the point of destination." *Id.* § 782.7(a)-(b)(1).

### C.   Binding Precedent Establishes That The Interstate Transportation Of Currency And Negotiable Instruments Is Interstate Commerce Under the MCA.

That Garda treats its drivers/messengers are exempt from the FLSA's overtime requirement pursuant to the Motor Carrier Exemption is hardly novel.  Indeed, binding Eleventh Circuit precedent clearly establishes that Plaintiff's and the Opt-in Plaintiffs' activities for Garda, transporting cash, coin, negotiable instruments and other valuables, between banks, the Federal Reserve Bank, bank processing centers, ATMs, commercial establishments like check cashing facilities and other locations, involve transportation of property in interstate commerce as defined by the MCA.  *Baez v. Wells Fargo Armored Service Corp.*, 938 F.2d 180, 181-82 (11th

7

Cir. 1991).   Wells Fargo, the defendant in *Baez*, and Garda work in the same industry, functioning in the same manner.   *Id.*   Like Plaintiff and the Opt-in Plaintiffs, the Wells Fargo employees in *Baez* served as drivers/messengers and worked only within Florida, transporting checks and currency to and from banks and other commercial institutions.   *Id.*   The *Baez* Court granted summary judgment for Wells Fargo, finding that such conduct constitutes interstate commerce under the MCA, and the Eleventh Circuit affirmed.   *See id*. at 181.

   *Hernandez v. Brink's, Inc.*, Case No. 08-20717-CIV-MOORE/SIMONTON, 2009 U.S. Dist. LEXIS 2726, at *7 (S.D. Fla. Jan. 15, 2009) is also on point.   Like Garda, Brink's is a secured transportation service company that provides armored vehicle transportation of customers' coin, cash, negotiable instruments and other valuables.   *Id.* at *1.   In *Brink's*, the court held that

> Brink's is a motor carrier that transports checks destined for banks outside of Florida and transports property destined for interstate and foreign locations.  It is unnecessary for an employee to engage in interstate travel as long as the property being transported is bound for an interstate destination. . . [T]he nature of Brink's relevant activities fall squarely within the meaning of interstate commerce for purposes of the Motor Carrier Act.

*Brink's*, 2009 U.S. Dist. LEXIS 2726, at * 7-8.

   Notably, Judge Moreno in this District recently granted final judgment in favor of Garda on the basis that, as a matter of law, Garda's armored truck drivers are exempt under the MCA exemption.  *Bule v. Garda CL Southeast, Inc.,* Case No. 1:14-cv-21898-FAM, Order on Motion for Judgment on the Pleadings as to Counts IV and V (July 17, 2014) (finding "Eleventh Circuit precedent establishes that Plaintiff's activities for Defendant, that is, transporting currency, coin, checks and other valuables between banks, the Federal Reserve Bank, bank processing centers,

check cashing facilities and other locations, involve transportation of property in interstate commerce as defined by the MCA."), attached as Exhibit 1.

Likewise, other district courts analyzing the application of the MCA exemption to the transportation of currency or negotiable instruments by Garda's drivers have reached the same conclusion.  In *Vallejo v. Garda CL Southwest, Inc.,* the U.S. District Court for the Southern District of Texas granted summary judgment for Garda on the plaintiff's FLSA claims, finding that the MCA exemption applies to armored car drivers/messengers because they transport checks, currency, and coins in interstate commerce.  Case No. 4:12-cv-00555*,* Memorandum and Opinion (September 29, 2014), attached as Exhibit 2; *see also Jamarillo v. Garda, Inc., et al.*, 2012 U.S. Dist. LEXIS 149468 (N.D. Ill. Oct. 17, 2012)(noting the uncontested fact that Garda is engaged in interstate commerce and granting summary judgment to Garda on plaintiffs' overtime claim), attached as Exhibit 3.

Similarly, in *McGee v. Corp. Express Delivery Sys.*, No. 10-C-1245, 2003 WL 22757757 (N.D. Ill. Nov. 20, 2003), a pick-up and delivery service spent over half of its time transporting checks to and from bank post office boxes, customer banks, check processing centers, the local Federal Reserve Bank, and the local clearinghouse all within the state.  The district court found that the defendant's transport of checks among these institutions constituted interstate commerce. *Id.*  It based its finding on the fact that the checks' senders had the intent when they sent the checks that they should travel interstate.  *Id.*  "They sent the checks to the bank's post office box, intending that they be received by the bank, the payee's account credited, and the check returned to the bank on which it was drawn by the author.  Thus, when [defendant's drivers] handled the checks, they were in the middle of their journey."  *Id.* at *4.

Further, the Department of Labor has also opined that drivers and driver helpers on armored

vehicles are covered by the MCA exemption in its Opinion Letters and Field Operations Handbook:

> (a) In the usual operation of an armored car company the vehicles transport checks drawn on out-of-State banks as well as coins and currency to a bank for subsequent out-of-State transmittal. The transportation to the main bank for further transmittal is part of a "practical continuity of movement" across State lines, making the Sec 13(b)(1) exemption applicable.

Wage-Hour Field Operations Handbook, 24c10(a) (2/26/99).

In noting that courts frequently find drivers of armored vehicles to be under the Secretary of Transportation's jurisdiction, the DOL stated:

> In construing the extent of the Section 13(b)(1) exemption, the courts have ruled that employees do not have to cross a state line to be subject to the exemption if they are transporting property destined for another state. Such property may consist of checks drawn on out-of-state banks transported by employees of an armored car company who do not drive across a state line.

1997 DOLWH LEXIS 19. (emphasis added).  What is more, the Department of Labor conducted an investigation of the exempt status of Garda's Tampa Branch drivers/messengers during the time period relevant to this lawsuit and determined that "the overtime exemption under the Motor Carrier Act was applicable and no violation was found."  (SUMF, ¶50).

Thus, based on well-established law in *Baez* and its progeny, as well as persuasive authority involving the very same employer and employee classification, as a matter of law, the Parties were engaged in the transportation of property in interstate commerce under the MCA and summary judgment is appropriate.

**D.**   **Plaintiff and the Opt-In Plaintiffs Are Exempt from the Overtime Provisions of the FLSA Pursuant to Section 213(b)(1)**

The undisputed material facts in this case establish that no departure from the precedent cited above is warranted.  As a matter of law, Garda is exempt from the overtime provisions of the FLSA in relation to Plaintiff and the Opt-in Plaintiffs because: (1) Garda is a Motor Carrier subject to the jurisdiction of the Secretary of Transportation; (2) Plaintiff and the Opt-In Plaintiffs were engaged in activities affecting the safety of motor vehicles and (3) Garda and Plaintiffs engage in interstate commerce under the Act.  *McIntyre v. FLX of Miami, Inc*., No. 08-20030-CIV, 2008 WL 4541017, at *4 (S.D. Fla. Oct. 8, 2008) (quoting *Baez v. Wells Fargo Armored Service Corp*., 938 F.2d 180, 181-82 (11th Cir. 1991)).  Accordingly, Plaintiff and the Opt-in Plaintiffs are exempt from overtime under the FLSA, and the MCA exemption warrants summary judgment in Garda's favor.

> **1.**     ***Garda is a "Motor Carrier" Subject to the Secretary of Transportation's Jurisdiction***

Garda is a "Motor Carrier" subject to the Secretary's jurisdiction under the MCA. Under the MCA, a "motor carrier" is "a person who provides commercial motor vehicle transportation for compensation."  49 U.S.C. § 13102(14).  A commercial motor vehicle is a vehicle weighing at least 10,001 pounds or with a gross vehicle weight rating ("GVWR") of at least 10,001 pounds, whichever is greater.  49 U.S.C. § 31132(1).  Here, it is undisputed that Garda transports cash, coins, negotiable instruments, and other valuables in its vehicles for compensation (SUMF, ¶1), and it is undisputed that the only trucks used by Plaintiff and the Opt-in Plaintiffs to perform their duties as a drivers/messengers all had a GVWR of more than 10,001 pounds.  (SUMF, ¶44).

It is also undisputed that Garda is Federal Motor Carrier Safety Administration ("FMCSA") certified company and holds U.S. Department of Transportation ("DOT") FMCSA number 193838.  (SUMF, ¶5).  Garda also has an assigned motor carrier number, MC-155115. (*Id*.).  These certifications require Garda to comply with the FMCSA's rules, regulations, and

procedures, *id.*, and establish that the DOT has exercised jurisdiction over it. *See Baez*, 938 F.2d at 182 (noting that the fact that the Interstate Commerce Commission, which had authority over the MCA at the time, issued a permit to a company indicated that MCA jurisdiction already had been exercised over that company); *Walters*, 575 F.3d at 1227. What is more, the FMCSA actively monitors Garda's activities and has indicated that an audit may be forthcoming. (SUMF, ¶7, 8).

Further, every Garda driver/messenger must comply with certain FMCSA regulations, and Garda is responsible for verifying that its driver/messenger are authorized under the FMCSA to drive Garda's vehicles. (SUMF, ¶10). Garda's drivers/messengers are required to undergo DOT medical examinations and drug testing. (*Id.* at ¶15, 16). Garda's driver/messenger must operate Garda's armored vehicles according to the safety standards set forth by the FMCSA, and the vehicles must be loaded and unloaded by Garda's driver/messenger in accordance with the safety standards set forth by the FMCSA. (*Id. at* ¶10). Plaintiff himself testified that both he and Garda were subject to the Federal Motor Carrier Safety Regulations while he was working at Garda. (*Id.* at ¶12). Given Plaintiff's insistence that there are no differences between him and the Opt-in Plaintiffs, this concession must apply equally to their employment with Garda as well.

Thus, jurisdiction has already been exercised by the Secretary. *See, e.g., Baez*, 938 F.2d at 182 ("[T]he permit issued by the [Interstate Commerce Commission] indicates that jurisdiction has already been exercised."); *Jaramillo v. Garda, Inc.,* 2012 WL 4955932, at *1 (N.D. Ill. Oct. 17, 2012) (granting summary judgment on Motor Carrier exemption and finding Garda CL Great Lakes, Inc., was a motor carrier.). Moreover, all of Garda's driver/messengers fall under the Secretary's Jurisdiction because their employment duties involve the safety of motor vehicles

weighing 10,001 pounds or more.  SAFETEA-LU Technical Corrections Act of 2008, Pub. L. 110-244, §306(a) and (c); Note to 29 U.S.C. §207.

      **2.**      ***Plaintiff's And the Opt-In Plaintiffs' Driver/Messenger Duties Directly Affected the Safety of Operation of Motor Vehicles***

Garda's drivers/messengers are engaged in activities that directly affected the operational safety of the armored vehicles.  The Secretary of Transportation has specifically determined that employees who (1) drive the motor vehicle; (2) ride on armored trucks in capacities other than that of driver, and (3) load and unload vehicles are responsible for, and affect the safety of, motor vehicles. 29 C.F.R. §§ 782.2(b)(1), 782.3 ("Drivers"), 782.4 ("Drivers Helpers"), 782.5 ("Loaders"); *see also Garza v. Smith Intl.,* 201 WL 835820, at \*5 (S.D. Tex. Mar. 7, 2011) (noting Motor Carrier Act exemption applies to drivers, drivers helpers and loaders and granting summary judgment on exemption).  Accordingly, the regulations prescribed under the Motor Carrier Act to address safety operations apply to the positions held by Plaintiffs.  *See, e.g.*, *Baez*, 938 F.2d 180 (Motor Carrier Act exemption applies to driver-guards and messenger-guards); *Brink's*, 2009 U.S. Dist. LEXIS 2726, \*10 (Plaintiffs who worked as Drivers [and Messengers] fall within the regulation's definition of drivers who affect the safety of operation and are therefore covered by the FLSA's motor carrier exemption.").

Additionally, the undisputed evidence is clear that Plaintiff's and the Opt-in Plaintiffs' duties and responsibilities affected the safety of the operation of the armored vehicles:

- Drivers must observe all security and safety procedures.  (SUMF, ¶25).

- When the driver is backing up the armored vehicle, the messenger must get out of the vehicle and assist the driver by standing behind the vehicle and providing direction. (SUMF, ¶27).

- The messenger must be prepared to drive the vehicle should the driver become incapacitated. (SUMF, ¶23).

- Both of the driver/messengers on a route, regardless of their role as a driver or messenger, are responsible for seeing that the armored vehicle is safe to drive and safely operated along the route and that the cash, coin, negotiable instruments and other valuables are safely transported. (SUMF, ¶25).

Therefore, the undisputed facts establish that Plaintiff's job duties affected the safety of operations of motor vehicles.

### 3. Plaintiff's and the Opt-In Plaintiffs' Activities Involved the Interstate Transportation of Goods

Plaintiff's and the Opt-in Plaintiffs' activities also involved the interstate transport of goods in the flow of commerce. The term "interstate commerce" is defined as "commerce between any place in a State and any place in another State, whether such commerce moves wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or water." *See* 42 Fed. Reg. 60078, 60079 (Nov. 23, 1977), citing former 49 U.S.C. § 303(a)(10).[3] Pursuant to the applicable regulations, the MCA exemption applies to employees who either (i) actually transport goods across state lines, or (ii) do not cross state lines but transport goods as a part of a "practical continuity of movement" across state lines from the point of origin to the point of destination. 29 C.F.R. 782.7; *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568, 63 S.Ct. 332, 335 (1943); *Billings v. Rolling Frito-Lay Sales*, LP, 413 F. Supp. 2d 817 (S.D. Tex. 2006) (granting defendant's motion for summary judgment based on the motor carrier exemption and denying overtime compensation to route sales representatives who transported products that were

---

[3] Section 203(a)(10) of the Interstate Commerce Act (49 U.S.C. § 303(a)(10) was replaced by Revised Interstate Commerce Act Provision, 49 U.S.C. § 10521, Pub. L. No. 95 473 § 4(b), 92 Stat. 1466 (1978); Pub. L. No. 97 449, § 7(b), 96 Stat. 2444 (1983), and subsequently by 49 U.S.C. § 31132. Pub. L. No. 98-554, § 204, 98 Stat. 2833 (1984). There is no substantive change in the definition and scope of the term "interstate commerce."

manufactured out of state from the Texas distribution center to Texas retailers despite the fact that the legs of the route sales representatives' journey were "entirely intrastate"); *Bilyou v. Dutchess Beer Dist. Inc.*, 300 F.3d 217, 223 (2d Cir. 2002) (granting summary judgment and applying the motor carrier exemption to delivery drivers who distributed out-of-state products within New York, and exported empty containers from out-of-state locales); *Chao v. First Class Coach Co., Inc.,* 214 F.Supp.2d 1263, 1272 (M.D. Fla. 2001) (holding that purely intrastate transportation can constitute part of interstate commerce if it is part of a "continuous stream of interstate travel.").

In reaching the conclusion that an employee is engaged in interstate commerce even if his or her duties require only the *intrastate* transport of goods, federal courts have applied the "practical continuity of movement" test set forth in *Walling v. Jacksonville Paper Co.*, 317 U.S. 564 (1943).   Under this test, "if there is a practical continuity of movement from the manufacturers or suppliers without the state, through [the employer's] warehouse and on to customers whose prior orders or contracts are being filled, the interstate journey is not ended by reason of a temporary holding of the goods at the warehouse." *Id.* at 568 ("Transportation [of a product] within a single state may remain 'interstate' in character when it forms a part of a 'practical continuity of movement' across state lines from the point of origin to the point of destination.").

The "characterization of transportation between two points in a State as interstate or intrastate in nature depends on the 'essential character' of the shipment.   Crucial to a determination of the essential character of a shipment is the shipper's fixed and persisting intent at the time of shipment." *State of Tex. v. United States of America and Interstate Commerce Comm'n*, 866 F.2d 1546, 1556 (5th Cir. 1989).   In its 1992 policy statement, the Interstate

Commerce Commission ("ICC")[4] promulgated a policy statement on the relevant inquiry for the determination of a shipper's intent when considering whether certain movement within a state constituted intrastate or interstate commerce. The ICC stated that "[t]he essential and controlling element in determining whether the traffic is properly characterized as interstate is whether the shipper has a 'fixed and persisting intent' to have the shipment continue in interstate commerce to its ultimate destination." 1992 Policy Statement, 1992 WL 122949, at *1. It went on to find that "[w]here the shipper has a 'fixed and persisting intent' that the merchandise continue in interstate or foreign commerce from or to an out-of-State origin or destination, via a warehouse or distribution center, is ascertained from *all the facts and circumstances surrounding the transportation*." *Id.* at *2 (emphasis added).

Accordingly, courts within the Eleventh Circuit draw a fixed and persisting intent "from all of the facts and circumstances surrounding the transportation." *Mena v. McArthur Dairy*, 352 Fed. Appx. 303, 306 (11th Cir. 2009), quoting *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Interstate Commerce Comm'n*, 921 F.2d 904, 908 (9th Cir. 1990) (citations omitted); *see also Walters*, 575 F.3d 1221 (noting that the Court is to be "guided by practical considerations" when determining whether an employee's activities are part of interstate commerce for the purposes of the FLSA); *Roberts v. Levine*, 921 F.2d 804, 812 (8th Cir. 1990); *Central Freight Lines v. Interstate Commerce Comm'n*, 899 F.2d 413, 421 (5th Cir. 1990). In making this determination, the courts looks to see if an employee's work "is actually in commerce or is so closely related to the movement of commerce that it is for practical purposes a part of it rather than an isolated local activity." *Walters v. Am. Coach Lines of Miami, Inc.*, 569 F. Supp. 2d 1270, 1289 (S.D. Fla. 2008), citing *Mitchell v. C.W. Vollmer & Co.,* 349

---

[4] The ICC has since been abolished and its functions absorbed by the Department of Transportation.

U.S. 427, 75 S. Ct. 860, 99 L. Ed. 1196 (1955)); *Vargas Rodilla v. TFC-RB, LLC,* 2009 U.S. Dist. LEXIS 104157, *24 (S.D. Fla. Nov. 4, 2009) (in determining whether a plaintiff was engaged in interstate commerce under the FLSA, factors such as "the extent to which admittedly interstate commerce would be impeded without the employee activity in question; the contribution the activity makes toward consummation of the interstate transaction or communication; the extent to which the employee activity enables instrumentalities of interstate commerce to effectively move commerce; the degree to which the activity is a part of a continuous stream of commerce; and the contractual and practical relationship between the activity and interstate commerce" were appropriately considered).

The transportation of currency and negotiable instruments-*i.e.,* the means through which interstate commerce is conducted-is clearly part of interstate commerce for purposes of the FLSA and MCA exemption.  Indeed, without cash logistics companies such as Garda, interstate commerce would be entirely disrupted.  For that reason, both binding and persuasive precedent clearly establish that Plaintiff's and the Opt-in Plaintiffs' activities for Garda, transporting cash, coin and checks, including checks drawn on out of state banks, and other valuables between banks, the Federal Reserve Bank, bank processing centers, commercial establishments, check cashing facilities and other locations, involve transportation of property in interstate commerce as defined by the MCA.  *E.g.*, *Baez v. Wells Fargo Armored Service Corp.*, *supra*.

That Garda's drivers/messengers do not actually cross state lines in their travels is not only irrelevant under applicable case law, as set forth, *supra*, but also fails to detract from the essential interstate nature of their activities.   All driver/messengers working in the Florida Branches, including Plaintiff and the Opt-in Plaintiffs, regularly transport currency and checks, including checks from banks outside the state of Florida.  (SUMF, ¶44).  No money "originates"

in Florida because currency is not printed and coin is not minted within the State.  (SUMF, ¶35).

Garda receives currency for deliveries from financial institutions and other armored

transportation couriers.  (SUMF, ¶36).  Garda's drivers/messengers also pick up cash and coin

from the Federal Reserve, a key conduct of interstate commerce, and transport the currency and

coin to the Florida Branches for delivery to its customers, who have placed an order for the

currency and coin to be delivered to them and that Garda's driver/messengers then deliver to its

customers the currency and coin received from the Federal Reserve.  (SUMF, ¶37).  Garda

receives currency from out-of-state Federal Reserve Branches and routinely receives and delivers

freshly printed bills and freshly minted coins to customers.  (SUMF, ¶39-40).

Garda delivers this money to a variety of customers serviced by its Florida Branches,

such as retailers, restaurants, check cashing stores, financial institutions, toll plazas, rest stops,

train stations, bus stations, airports, cruise lines, government institutions, theme parks, and

ATMs.  (SUMF, ¶31-34).  Garda will also pick up deposits, which include U.S. currency, foreign

currency, and checks drawn on out-of-state banks, from these customers and their ATMs, for

subsequent delivery to their financial institution's central bank.  (SUMF, ¶19, 20, 43, 44).  The

ease by which the currency transported by Garda's drivers/messengers can end up out-of-state, or

is received from out-of-state, is demonstrated by Garda's own operations.  For example, Garda's

Jacksonville Branch services ATMs in Georgia.  The money that is used to replenish the ATMs

is delivered to the Jacksonville Branch by drivers/messengers from the Orlando Branch and the

deposits from those ATMS are subsequently delivered to the Orlando Branch for distribution to

that financial institution's customers.  (SUMF, ¶4, n. 4).

Further, driver/messengers on Garda's "Commercial," "ATM," and "mixed" routes

regularly transport hundreds of checks, including checks from banks outside of Florida.  (SUMF,

¶¶19-21).  The Florida Branches also use third party carriers to ship checks picked up from ATMs and retail customers to out-of-state processing centers, to return potentially counterfeit money to the U.S. Secret Service, and to ship safety deposit boxes.  (SUMF, ¶45-47).  As such, it is clear that Plaintiff and the Opt-in Plaintiffs transported goods as a part of a "practical continuity of movement" across state lines from the point of origin to the point of destination.

Moreover, an employee loses the FLSA's protection over overtime pay under the MCA exemption if the employee, based on the circumstances of his job, is reasonably likely to carry out activities affecting the safety of interstate transportation operations.  *See e.g. Lucas v. Noypi, Inc.*, H-11-1940, 2012 WL 4754729 at * (S.D. Tex. Oct. 3, 2012); *Mitchell v. C & P Shoe Corp.*, 286 F.2d 109, 114 (5th Cir. 1960).  The Department of Labor's regulations provide that armed guards on armored trucks activities "directly affect the safety of operation of such motor vehicles in interstate or foreign commerce." 29 C.F.R. § 782.4(a).  Not only has Garda established that Plaintiff and the Opt-in Plaintiffs were actually regularly transporting currency from the Federal Reserve that had been ordered for delivery by Garda's customers and checks from out-of-state banks; but at the very least, Garda has established that Plaintiff *could* have been called upon to engage in interstate transportation activities at any time and on any given day.  It is undisputed that any drivers/messenger, including Plaintiff, could be assigned any route or assignment on any given day at Garda's sole discretion. (SUMF, ¶16).  Accordingly, even if Plaintiffs were not actually engaging in these interstate activities – which they were – they could have been called upon to do so at any time.  Therefore, Garda has established that Plaintiff and the Opt-in Plaintiffs were covered by the MCA exemption and their overtime claim under the FLSA fail as a matter of law.

      E.    **If Summary Judgment Is Not Granted On The Class Members' Claims, Then Decertification Is Appropriate.**

On a motion to decertify, plaintiffs must prove that class members are similarly situated and must demonstrate a reasonable basis for their claim of classwide FLSA violations. *Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1096-97 (11th Cir. 1996).  At this decertification stage, plaintiffs bear a heavier burden than at the initial stage. *Smith v. Tradesmen Int'l, Inc.*, 289 F. Supp. 2d 1369, 1372 (S.D. Fla. 2003).  When evaluating whether class members are similarly situated, courts typically consider: (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants that appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007). "The three factors of this analysis "are not mutually exclusive — there is considerable overlap among them. Each factor directly influences the others." *Knott v. Dollar Tree Stores, Inc.*, 897 F. Supp. 2d 1230, 1234 (N.D. Ala. 2012).

As set forth above, Plaintiff and the Opt-in Plaintiffs are exempt from the FLSA's overtime requirement as a matter of law.  If the Court concludes that it cannot determine the Opt-in Plaintiffs' exempt status on this record, which Garda submits that it can, it can only be because an individual inquiry into the application of the exemption is necessary.  In that event, reliance on representative evidence would be inappropriate.  Thus, if summary judgment is not granted, procedural and fairness considerations require that the cases be resolved on an individual, as opposed to a class, basis given the large number of opt-ins (115) and the need for individualized testimony.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, Garda respectfully requests that the Court grant this motion and enter final summary judgment in its favor with respect to Plaintiff's claim, as well as the claims of the Opt-in Plaintiffs.

Dated this 17th day of February, 2015.

**LITTLER MENDELSON, P.C.**
Wells Fargo Center
333 SE 2nd Avenue, Suite 2700
Miami, Florida  33131
Telephone:  (305) 400-7500
Facsimile:  (305) 603-2552

By: */s/ Jessica T. Travers*
       Scott A. Forman
       Florida Bar No. 0065950
       E-mail:  sforman@littler.com
       Jessica T. Travers
       Florida Bar No. 0018129
       E-mail:  jtravers@littler.com
       *Counsel for Defendant,*
       *Garda CL Southeast, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on this 17th day of February, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

       */s/ Jessica T. Travers*
       Jessica T. Travers

**U.S. District Court**
**Southern District of Florida (Miami)**
**CIVIL DOCKET FOR CASE #: 1:13-CV-23173-DPG**

**COUNSEL FOR PLAINTIFF:**
Bernard R. Mazaheri
Morgan & Morgan
20 N Orange Ave Ste 1600
Orlando, Florida 32801
Telephone: (407) 420-1414
Facsimile: (407) 245-3487
Email: bmazaheri@forthepeople.com
*[Via Notice of Electronic Filing]*

**COUNSEL FOR DEFENDANT:**
Scott A. Forman
Florida Bar No. 0065950
E-mail:  sforman@littler.com
Jessica T. Travers
Florida Bar No. 0018129
E-mail:  jtravers@littler.com
Littler Mendelson, P.C.
Wells Fargo Center
333 SE 2nd Avenue, Suite 2700
Miami, Florida  33131
Telephone:  (305) 400-7500
Facsimile: (305) 603-2552
*[Via Notice of Electronic Filing]*

Firmwide:129173095.2 067762.1222